UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| BRENDA R. LEE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | 4:15-cv-00097-RLY-TAB |
| | ) | |
| MICHAEL J. WALRO, as Trustee of the Bankruptcy Estate of Lester L. Lee, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| LESTER L. LEE, | ) | Bankruptcy Case |
| | ) | 12-90007-JJG-7A |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| MICHAEL J. WALRO, as Trustee of the Bankruptcy Estate of Lester L. Lee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary Proceeding |
| | ) | 13-59041 |
| BRENDA R. LEE, | ) | |
| | ) | |
| Defendant. | ) | |

**APPEAL FROM THE UNITED STATES BANKRUPTCY COURT**

Brenda R. Lee, wife of Chapter 7 debtor Lester L. Lee, appeals a final judgment entered against her by the Honorable Jeffrey Graham of the United States Bankruptcy Court for the Southern District of Indiana on various counts of a Complaint filed by the bankruptcy trustee, Michael J. Walro. The Trustee sought to avoid fraudulent transfers

1

made to Brenda by Lester, and to recover the transferred property or the value thereof for the benefit of the estate. The transfers at issue on appeal involve real estate and stock in two companies. For the reasons set forth below, the court **AFFIRMS** the judgment of the Bankruptcy Court.

**I. Facts**[1]

Before recounting the material facts, it is necessary for the court to define a few of the key parties. The Lee Group Holding Company, LLC is an Indiana limited liability company owned by Lester's three adult children and Brenda. (Findings and Conclusions at Finding of Fact ("FF") 3). Lester served as the "manager" of the Lee Group. (*Id.* at FF 5). Lees Inns of America ("LIA") is a regional network of motels. (*Id.* at FF 45). At all times relevant, Lester was a shareholder, the President, and the Director of LIA. (*Id.*). The William R. Lee Irrevocable Trust was created in the name of William Lee, Lester's brother; William's sons serve as trustees. *Lees Inns of Am., Inc. v. William R. Lee Irrevocable Tr.*, 924 N.E.2d 143, 148 (Ind. Ct. App. 2010). The Trust was a minority shareholder in LIA until Lester bought it out in 2000, thereby making himself the sole shareholder. *Id.* at 149. Johnson County Motel Corporation ("JCMC") and Bi-Rite Oil Company, Inc. are Indiana corporations, and prior to the transfers at issue in this adversary proceeding, Lester was the sole shareholder of both companies. (Findings and Conclusions at FF 14-15). Lastly, Lee's Real Estate Investments, LLC is an Indiana

---

[1] All citations to the record are to materials Brenda designated when she filed her Notice of Appeal. (*See* Filing Nos. 3-1 through 3-56). Neither party compiled an appendix.

limited liability company, and, at all times relevant, Lester was the managing member. (Trustee's Exhibit 63, Amended Agreed Judgment at 6).

Following Lester's buyout of the Trust in 2000, many years of bitter family litigation ensued. On December 8, 2008, the Trust obtained a judgment against LIA for the sum of $7,522,879.73 in the Jennings Circuit Court (the "Trust Judgment"). (Findings and Conclusions at FF 45). In the Trust Judgment, the state court found that Lester deliberately harmed the Trust by certain acts and omissions, and that such acts and omissions constituted fraud. (*Id.* at FF 46). The court emphasized a public statement made by Lester wherein he promised that he would "screw [the Trust] at every opportunity" and "do everything to make sure [the Trust] never receive[d] one dime from this company." (*Id.*).

Unfortunately for the Trust, LIA no longer had any assets by the time that judgment was entered. A few months earlier, in July 2008–while the Trust lawsuit was pending and shortly before trial in that matter–Lester, the Lee Group, JCMC, and Lee's Real Estate Investments filed an action against LIA to foreclose on alleged security interests. (*Id.* at FF 47). Most of the claims arose from a note issued by LIA just a month earlier, in June 2008. (Trustee's Exhibit 62). In October 2008, Lester obtained an Amended Agreed Judgment–signed by himself on behalf of every party in that case (i.e., each plaintiff *and* the defendant)–that granted a judgment against LIA in favor of the plaintiffs for $7,846,686.87. (Amended Agreed Judgment; Findings and Conclusions at FF 48). By way of an assignment, Lester then conveyed all of LIA's assets to the Lee Group in satisfaction of the Amended Agreed Judgment. (Findings and Conclusions at

3

FF 49). At the trial in this matter, Lester testified that his actions were "absolutely" intended to prevent the Trust from recovering against LIA. (*Id.* at FF 50).

While the Trust Judgment was not against Lester personally, the Bankruptcy Court "readily conclude[d] that [Lester] anticipated that it was likely just a matter of time before the Trust pursued him personally." (*Id.* at Conclusion of Law ("CL") 15). On January 2, 2009, just a month after the Trust Judgment was issued, Lester conveyed by quitclaim deed four parcels of land in Shelby County, Indiana to Brenda. (*Id.* at FF 7-10). Brenda did not provide any consideration beyond what she describes as "love and affection" as Lester's wife. (*Id.* at FF 11). The quitclaim deeds were all recorded on May 25, 2010. Prior to that recording, on April 28, 2010, one of these lots ("Property No. 2") was sold to SHIV Development, LLC for $550,000.00, with $202,345.86 in net proceeds to the seller. (*Id.* at FF 12). On the Seller's Closing Statement, Lester, not Brenda, was listed as the seller. (*Id.*). SHIV Development recorded its Warranty Deed on May 17, 2010. (Trustee's Exhibit 11). The deed is signed by Lester, and it lists Lester as the "Grantor." (*Id.*). The proceeds of the transaction were immediately "loaned" to the Lee Group, as evidenced by a note payable to both Brenda and Lester. (Findings and Conclusions at FF 13).

On January 5, 2009, Lester transferred to Brenda all of his shares in JCMC and Bi-Rite. (*Id.* at FF 16). Brenda did not provide any consideration beyond what she describes as "love and affection" as Lester's wife. (*Id.* at FF 17). According to its own balance sheet, JCMC had assets of $2,218,879.32 and liabilities of $0 as of December 31, 2008. (*Id.* at FF 18). Brenda testified that she could not dispute the accuracy of those

4

figures. (Tr. I 29:8-16).[2] In his Final Statement of Financial Position ("Financial Statement")[3], Lester valued his ownership interest in JCMC as of October 31, 2008 at $2,631,242.00. (Trustee's Exhibit 54). According to Brenda, JCMC was "basically a dead corporation" at the time of trial, in February 2015. (Tr. I 29:11-12).

According to its own balance sheet, Bi-Rite had assets of $2,058,192.33 and liabilities of $723,632.23, for a net worth of $1,334,560.10, as of December 31, 2008. (Findings and Conclusions at FF 20). Brenda testified that she could not dispute the accuracy of those figures. (Tr. I 29:17-23, 30:5-11). In his Financial Statement, Lester valued his ownership interest in Bi-Rite as of October 31, 2008 at $2,634,231.00. (Trustee's Exhibit 54). According to Brenda, Bi-Rite was worth "significantly less" at the time of trial. (Tr. I 29:24-25). This was due, in large part, to environmental issues associated with leaking oil tanks. (*Id.* 30:1-4; Tr. II 24:11-23). Lester testified that he discovered the leaks "after 2008." (Tr. II 24:11-25:1).

In December 2010, the Trust filed a petition to pierce the corporate veil in an effort to collect the Trust Judgment from Lester personally. (Findings and Conclusions at FF 51). Lester filed for Chapter 7 bankruptcy approximately one year later, in January 2012. (*Id.* at FF 1).

---

[2] The trial in the Bankruptcy Court was held over two days, February 18-19, 2015. Therefore, there are two transcripts in the record. The transcript from February 18 is cited as "Tr. I [page:line]"; the transcript from February 19 is cited as "Tr. II [page:line]."
[3] Lester's Financial Statement is a two-page document that lists his assets and liabilities. The statement is divided into two columns, with a description of the assets and liabilities in one column, and the "current value" for each item in the other column. The document is signed by Lester, but it does not provide an explanation for how he arrived at any of the numbers.

5

**II. Procedural History**

The Trustee filed an Adversary Proceeding against Brenda on July 3, 2013, alleging that Brenda received fraudulent transfers from Lester. Count I of the Second Amended Complaint sought to avoid and recover four real estate parcels transferred from Lester to Brenda. Count II sought the turnover of property, alleging certain sums transferred to Brenda belonged to the estate. Counts III and IV sought to avoid and recover certain notes transferred from Lester to Brenda. Count V sought to avoid and recover shares of stock in Bi-Rite and JCMC transferred from Lester to Brenda. Count VI sought to avoid and recover interest in a bank account transferred from Lester to Brenda.

The Bankruptcy Court held a trial on February 18-19, 2015. The parties stipulated to many of the relevant facts and the admissibility of many exhibits the day before trial. The Bankruptcy Court rendered its Findings of Fact and Conclusions of Law and Judgment on June 16, 2015. The court entered judgment for the Trustee on the transfers of real estate, notes, and shares of stock, and judgment for Brenda on the money transfers and the bank account interest.

In its Findings and Conclusions, the court held that there was "overwhelming evidence" that Lester transferred the real estate and shares of stock with fraudulent intent. The Bankruptcy Court therefore avoided the transfers pursuant to 11 U.S.C. § 544(a)(1) and the Indiana Uniform Fraudulent Transfer Act, Ind. Code §§ 32-18-2-1 *et seq*. It then concluded that the Trustee was entitled to recover certain property and a total of $3,755,785.28. That sum included $202,345.86 for Property No. 2, $2,058,192.33 for the

JCMC shares, and $1,334,560.10 for the Bi-Rite shares. The Bankruptcy Court awarded the value of that property rather than ordering its return because Property No. 2 had already been sold and the shares of stock had depreciated.

This appeal ensued.

### III. Questions Presented and Standards of Review

Brenda presents four issues on appeal, which the court restates as follows:

1. Did the Bankruptcy Court err by citing the Trust Judgment as support for its finding that Lester committed actual fraud pursuant to the IUFTA? A bankruptcy court's evidentiary decisions are reviewed deferentially for abuse of discretion. *See First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 777-78 (7th Cir. 2013).

2. Did the Bankruptcy Court err by choosing to award the Trustee the value of the Bi-Rite and JCMC shares instead of ordering Brenda to return them? A bankruptcy court's decision to award money in place of the transferred property is reviewed deferentially for abuse of discretion. *Hebenstreit v. Kaur*, 619 F. App'x 529, 531 (7th Cir. 2015); *Bank of Am., N.A. v. Veluchamy*, 535 B.R. 783, 800 (N.D. Ill. 2015).

3. Did the Bankruptcy Court err in determining the value of the Bi-Rite and JCMC shares? Valuation is a question of fact that is subject to clear error review. *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1232 (7th Cir. 1990).

4. Did the Bankruptcy Court err in awarding a judgment against Brenda for the value of Property No. 2? This is a mixed question of law and fact that is reviewed de novo. *Grede v. FCStone, LLC*, 746 F.3d 244, 251 (7th Cir. 2014).

7

**IV. Discussion**

The court examines the four issues in order, and, finding no error, affirms the Bankruptcy Court.

**A. Citing the Trust Judgment**

Brenda does not challenge the finding of fraudulent intent directly. In other words, she does not review the evidence and then show how it was collectively insufficient to support a finding of fraud under the IUFTA. Rather, she narrowly challenges the Bankruptcy Court's citation to one piece of evidence, the Trust Judgment. While her argument is somewhat unclear, she seems to suggest that because the court relied on that piece of improper evidence, its entire analysis on the issue of fraud was tainted. This court should therefore conduct a new, independent analysis.

The court disagrees. Critically, Brenda wholly ignores that she stipulated to the authenticity and admissibility of this document just before trial. (*See* Stipulation of Facts and Exhibits at 10). The stipulation does not contain any limiting language, such as a statement that the judgment could only be admitted for a particular purpose. A litigant cannot stipulate to a document's admissibility at trial and then allege error on appeal when the trial court cites to that document in its ruling. Assuming, *arguendo*, that it was error to admit the Trust Judgment into evidence, Brenda herself created that error when she entered into the stipulation.

Brenda maintains that the Bankruptcy Court "relied so heavily on those proceedings as to elevate the Jennings Circuit Court's findings and conclusions into a de facto res judicata case against Brenda." (Filing No. 9, Appellant's Brief at 12). This

argument reflects a misunderstanding of both the Bankruptcy Court's judgment and res judicata. First, the Bankruptcy Court did not rely exclusively on the state court judgment in arriving at its conclusion that Lester committed actual fraud. Rather, the court concluded that there was "overwhelming evidence" of fraud, and specifically noted that the transfers: (1) began shortly after the Trust obtained a substantial judgement against LIA, (2) were largely contemporaneous, (3) greatly reduced Lester's estate, and (4) were made to his wife for no tangible consideration. (Findings and Conclusions at CL 14-18). The court added, "[T]he most compelling evidence before the Court is [Lester]'s own admission [at trial] that he effectuated the LIA Judgment in an effort, in the very least, to hinder and delay the Trust." (*Id.* at CL 19). It was only after reciting all of that evidence that the Bankruptcy Court briefly discussed the Trust Judgment. Notably, the Bankruptcy Court focused primarily on a quotation within the judgment–specifically, a statement Lester made at a shareholders' meeting–and not on the court's legal conclusions. Brenda therefore makes a significant stretch of the record when she states that the court "heavily" relied on the Trust Judgment.

Res judicata, also known as claim preclusion, is an equitable doctrine that "bars claims that were litigated or could have been litigated in a previous proceeding." *Arrigo v. Link*, 836 F.3d 787, 798-99 (7th Cir. 2016). Put more simply, res judicata prevents a party from pursuing claims that he already brought, or at least already had the chance to bring. This is plainly inapplicable to the instant case. The doctrine Brenda likely meant to invoke–collateral estoppel, also known as issue preclusion, which "bars relitigation of issues determined in prior court actions," *Gambino v. Koonce*, 757 F.3d 604, 608 (7th

9

Cir. 2014)–is also inapplicable.  The Bankruptcy Court did not simply adopt the findings of the Jennings Circuit Court.  Rather, it properly considered the judgment as but one piece of evidence indicating Lester acted with fraudulent intent.  The court reviewed many other pieces of evidence supporting the Trustee's allegations, weighed that evidence against Lester's explanation for the transfers, and ultimately came to its own conclusion.  Accordingly, the fact that Brenda was not a party in the state court action is immaterial.

In her reply, Brenda morphs this argument into something else entirely, contending that the Bankruptcy Court's findings effectively constitute a collateral attack on the Amended Agreed Judgment.  She waived this argument by waiting until her reply brief to raise it.  *United States v. Lacy*, 813 F.3d 654, 658 (7th Cir. 2016).

For these reasons, the Bankruptcy Court did not commit an abuse of discretion by citing the Trust Judgment in its Findings and Conclusions.

### B. Awarding a Money Judgment Instead of Ordering a Return of Property

Brenda next avers that the Bankruptcy Court erred by entering a money judgment against her rather than ordering a return of the shares in Bi-Rite and JCMC.  The Bankruptcy Code provides,

> [T]o the extent that a transfer is avoided under section 544 . . . , the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). The purpose of Section 550 is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *Jubber v. Bank of Utah (In re C.W. Mining Co.)*, 749 F.3d 895, 898 (10th Cir. 2014) (quotation marks omitted).

Section 550(a) "does not explain when a court should award the trustee recovery of the actual property and when it should, in the alternative, award the trustee recovery of the value of the property." *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 890 (9th Cir. 2010). Accordingly, it is well established that the choice between the two remedies is left to the bankruptcy court's discretion. *Hebenstreit*, 619 F. App'x at 531; *Veluchamy*, 535 B.R. at 800. Nonetheless, appellate courts have provided a framework to guide analysis on this issue. Ordering a return of the property itself is most appropriate when: (a) the record is devoid of evidence on the property's value, or (b) there is conflicting evidence on the value of the transferred property. On the other hand, allowing the Trustee to recover the pre-transfer value of the property is most appropriate when: (a) the property is unrecoverable, (b) the property's value has been diminished by conversion or depreciation since the transfer, or (c) the value of the property is readily determinable and a monetary award would work a savings for the estate. *Rodriguez v. Drive Fin. Servs. L.P. (In re Trout)*, 609 F.3d 1106, 1112 (10th Cir. 2010); *In re Taylor*, 599 F.3d at 890.

In this case, the Bankruptcy Court found that the shares of Bi-Rite and JCMC had depreciated since the transfer, and therefore awarded the Trustee the value of the stock. The Bankruptcy Court allegedly abused its discretion because (1) there was insufficient evidence in the record to allow the court to determine the value of the two companies,

and (2) there was insufficient evidence of depreciation. The court rejects both arguments. First, for reasons discussed in the next section, the court finds that there was sufficient evidence for valuation in the record.

Second, the Bankruptcy Court reasonably determined that returning the shares would not restore the estate's pre-transfer financial condition because the shares had significantly decreased in value. At trial, Brenda (who was at that time the sole shareholder of Bi-Rite and JCMC) was asked about the December 2008 balance sheets for both companies. Those balance sheets reflect the net worth of the companies less than one week before Lester made the transfers, and they reveal that JCMC and Bi-Rite were worth $2,218,879.32 and $1,334,560.10 respectively. During this line of questioning, she stated that Bi-Rite was worth "significantly less" and JCMC was "basically a dead corporation" as of the date of trial. Notably, Brenda's counsel did not object on the basis that she was incompetent to testify as to the present value of the companies, or that there was a lack of foundation for her knowledge on the subject. Furthermore, no other evidence on the present value of the companies was ever introduced. In other words, there was nothing in the record to contradict Brenda's assessment. The Bankruptcy Court reasonably credited her testimony and concluded that the Bi-Rite and JCMC shares had depreciated. This meant that awarding the value of the transferred property was most appropriate.

Therefore, the Bankruptcy Court did not abuse its discretion by entering a money judgment against Brenda instead of ordering a return of the Bi-Rite and JCMC shares.

### C. Valuing the Bi-Rite and JCMC Shares

Next, Brenda challenges the Bankruptcy Court's valuation of the Bi-Rite and JCMC shares. "The market price at the time of transfer is the proper measure of § 550 damages." *Kepler v. Sec. Pac. Hous. Servs. (In re McLaughlin)*, 183 B.R. 171, 177 (Bankr. W.D. Wis. 1995). The terms "market price" and "market value" refer to "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction." *Fair market value*, Black's Law Dictionary (10th ed. 2014). This figure constitutes proper recovery "because that is what the debtor would have been able to get for [his] [property] had it not been improperly transferred." *In re James B. Downing & Co.*, 74 B.R. 906, 911 (Bankr. N.D. Ill. 1987).

Brenda initially asserts that the valuation of a business requires expert testimony, and because no expert testimony was ever introduced, the Bankruptcy Court committed reversible error. While it is true that an expert did not testify as to what each company was worth, the court is unable to find any binding authority that expressly requires this. Brenda fails to point to a single case, evidentiary rule, or statute that explicitly states courts must have expert testimony in order to value a corporation in the context of 11 U.S.C. § 550(a). Without this, the court cannot hold that the Bankruptcy Court erred. Moreover, the Federal Rules of Evidence suggest an expert is not always necessary to value a business. *See* Fed. R. Evid. 701 advisory committee's note to 2000 amendments ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.").

13

She then claims that even if expert testimony was not required, there was simply not enough evidence in the record for the Bankruptcy Court to determine market price. There were two pieces of evidence introduced at trial concerning valuation: (1) Lester's Financial Statement, and (2) the balance sheets for each company. Brenda advances specific arguments for each piece of evidence and then a broader argument about the collective sufficiency of the evidence.

First, she contends that the Bankruptcy Court should not have even considered Lester's Financial Statement. According to her, a business owner may only testify to the market value of his business if a proper foundation has been laid. The business owner must demonstrate that he is competent to testify on the value of his company based upon his familiarity with the day-to-day operations of the company, its expected profits and losses, and the unique opportunities and challenges facing the company. Without this foundation, a court has no way to know whether the owner is basing his assessment on personal knowledge or pure speculation. The court agrees with this general rule. However, in advancing this argument, Brenda again ignores that she stipulated to the admissibility of Lester's Financial Statement.

After the Trustee highlighted this in his brief, Brenda attempted to avoid the problem by stating that her argument is not one of admissibility; rather, it is one of sufficiency. This shift is clever, but ultimately unavailing. Despite her claim to the contrary, Brenda is absolutely attacking the admissibility of Lester's Financial Statement. Lack of foundation is an objection lodged in an attempt to prevent testimony or a document from being formally admitted into evidence. If Brenda wanted to argue that

Lester was not competent to testify as to the market value of JCMC or Bi-Rite, she should not have agreed to the stipulation.  Likewise, if she wanted to ensure proper foundational testimony was elicited before the Financial Statement could be used, she should have made note of that condition on the stipulation.  The court reiterates: a litigant cannot stipulate to a document's admissibility at trial and then allege error on appeal when the trial court cites to that document in its ruling.  Assuming, *arguendo*, that it was error to admit Lester's Financial Statement into evidence, Brenda herself created that error when she entered into the stipulation.

Second, Brenda contends that the Bankruptcy Court should not have relied upon the balance sheets because they are misleading.  For example, she states that the largest asset on the Bi-Rite balance sheet is "notes receivable – shareholder," and the shareholder (Lester) was "essentially insolvent" at the time of the transfer.  Additionally, Bi-Rite had a leaking underground storage tank liability that existed at the time of the transfer, but was unknown to the parties.  Furthermore, a critical examination of the JCMC balance sheet purportedly shows that (a) it had no property or equipment, (b) it had very little accounts receivable, and (c) its primary assets were notes receivable that were "basically uncollectable."  The Trustee effectively rebuts all of these arguments.  In short, there was no evidence at trial that Lester was insolvent at the time of the transfers, and this argument is belied by his Financial Statement.  Likewise, there was no evidence indicating when Bi-Rite's environment problems likely arose.  Rather, Lester only testified that he *discovered* the issue "after 2008."  Finally, there was no evidence at trial that JCMC's notes receivable were uncollectable.

15

With those specific arguments rejected, the court returns to the ultimate issue: whether the Bankruptcy Court committed clear error when it calculated a value for JCMC and Bi-Rite based upon Lester's Financial Statement and the balance sheets. Brenda claims that the Bankruptcy Court should have reviewed audited financial statements, bank account statements, environmental assessments, tax returns, contracts, notes, and security agreements before determining a value. The Trustee retorts: (1) Lester's opinion is worth substantial weight because he was the owner of the companies and he had significant business acumen, as demonstrated by the fact that he served as manager of 40 companies; (2) Lester's Financial Statement was prepared just a few months before the transfers; (3) the balance sheets are objective and thorough, showing fluctuating assets, such as cash, notes, and accounts receivable, and liabilities, such as notes and accounts payable; (4) the balance sheets were prepared just days before the transfers; (5) Brenda testified at trial that she could not dispute the accuracy of the numbers in the balance sheets; and (6) of the two sets of figures provided for each company (one from Lester's Financial Statement and the other from the balance sheets), the Bankruptcy Court adopted the more conservative figures.

This is a close question, but the court must affirm based upon the standard of review. The clear error standard is "highly deferential," *Cont'l Cas. Co. v. Symons*, 817 F.3d 979, 985 (7th Cir. 2016), and it "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot

be clearly erroneous." *Id.* at 574. There are two permissible views of the evidence here–one that Lester's Financial Statement and the balance sheets are sufficient to support a fair valuation of the two companies, and the other that more is needed–and both are reasonable. Therefore, the Bankruptcy Court did not commit clear error.

**D. Property No. 2**

Finally, Brenda claims the Bankruptcy Court erred in entering a money judgment against her for the value of Property No. 2 pursuant to Section 550(a). She essentially claims that this portion of the judgment is fundamentally unfair because the property was never actually conveyed to her. While Lester did execute a quitclaim deed in favor of Brenda for this property, that conveyance was ineffective as to any third parties without notice because the deed was not promptly recorded. Prior to her recording the quitclaim deed, Lester sold the property to SHIV Development and SHIV Development recorded its warranty deed. Brenda could not have challenged SHIV Development's right to the property because it had no notice of her deed. Brenda also emphasizes that Lester (1) is listed as the seller on the closing statement for the sale to SHIV Development, (2) is listed as the grantor on SHIV Development's warranty deed, and (3) received and controlled the proceeds of the sale.

The problem with this argument is that it conflates a conveyance that is effective against third parties without notice (a "perfect conveyance") under Indiana law with a transfer under the Bankruptcy Code. These concepts are not synonymous. The Bankruptcy Code defines "transfer," in relevant part, as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property

17

or an interest in property." [4] 11 U.S.C. § 101(54). The legislative history of this subsection reveals that Congress drafted the definition "as broad as possible." *San Jose v. McWilliams*, 284 F.3d 785, 793 (7th Cir. 2002). When Lester executed the quitclaim deed for Property No. 2 in favor of Brenda, he made a transfer because he parted with his interest in the land. Brenda was the "initial transferee" because Lester gave his interest in the property to her. She is therefore liable for the value of Property No. 2 under the plain language of Section 550(a).

The fact that Lester's transfer to Brenda was not a perfect conveyance is immaterial. Indiana law provides:

> A conveyance of any real estate in fee simple or for life, a conveyance of any future estate, or a lease for more than three (3) years after the making of the lease is not valid and effectual against any person other than:
>
> (1) the grantor;
>
> (2) the grantor's heirs and devisees; and
>
> (3) persons having notice of the conveyance or lease;
>
> unless the conveyance or lease is made by a deed recorded within the time and in the manner provided in this chapter.

Ind. Code § 32-21-3-3. As this statute makes clear, Brenda's delayed recording only meant that the conveyance was ineffective against third parties without notice. Thus, the

---

[4] "The Bankruptcy Code does not provide a definition for either the term 'property' or the term 'interest in property.' However, those terms should be construed extremely broadly, encompassing virtually every right that a debtor has at the time of filing. Congress intended to bring 'anything of value' into the estate." *Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.)*, 351 B.R. 529, 570 (Bankr. N.D. Ill. 2006) (citation omitted). *See interest*, Black's Law Dictionary (10th ed. 2014) ("A legal share in something; all or part of a legal or equitable claim to or right in property.").

18

conveyance was effective against Lester, Lester's heirs and devisees, and third parties with notice. This reinforces the court's conclusion that Brenda had an interest in Property No. 2. Indeed, until the SHIV Development transaction, Brenda was seemingly the *only* person with an interest in the property.

Brenda's allegation that Lester retained control over the land is likewise immaterial. Nothing in the text of Section 550(a) suggests that the initial transferee must have complete control over the transferred property. Brenda received an interest in the land, and that is enough to impose liability.[5] Accordingly, the Bankruptcy Court did not err in entering a judgment against Brenda for the value of Property No. 2.

**V. Conclusion**

The judgment of the United States Bankruptcy Court for the Southern District of Indiana is **AFFIRMED**.

**SO ORDERED** this 13th day of February 2017.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

Distributed by U.S. Mail to:
Brenda R. Lee
605 Scenic Drive
North Vernon, IN 47265

---

[5] The court also questions Brenda's assertion that Lester received and controlled the proceeds from the sale. As the Bankruptcy Court noted, the evidence shows that she and Lester together loaned the proceeds to the Lee Group and took a promissory note in return. (Findings and Conclusions at CL 26 n.8; Trustee's Exhibits 31, 32).

19